ELMORE, Judge.
Following a mistrial on 1 April 2002, defendant pled guilty to attempted first degree statutory rape. Pursuant to N.C. Gen. Stat. § 15A-979, defendant appeals several decisions of the trial court denying his motions to suppress. We affirm the trial court's denial of the suppression motions.
Originally, defendant was indicted and tried for statutory rape, two counts of statutory sex offense, and three counts of indecent liberties with a minor, each arising out of a 25 August 2000 incident with his daughter, S.B. About a week later S.B. reported the incident with her father to a friend's mother, who was also affiliated with S.B.'s school. In the interim, S.B. hadcleaned the sheets, clothes, and any other material which might have contained evidence of defendant's actions. After an investigation, a trial ensued, but the jury deadlocked and the trial court declared a mistrial. Defendant was scheduled for retrial, but after several motions regarding the suppression of evidence were denied, defendant entered a guilty plea to attempted first degree statutory rape. We will address the denial of each motion in turn.
Defendant assigns error to the trial court's denial of his motion to suppress the confession elicited during an interview with Detective D.M. Frye. We affirm the trial court's denial of the motion on the basis that defendant was not in custody at the time of questioning, and therefore not yet entitled to an instruction following Miranda.
Shortly after the incident was reported by S.B's friend's mother, Deputy William Loftis, of the Guilford County Sheriff's Department, responded by notifying Clayton Coward of the Department of Social Services (DSS) and taking S.B. into protective custody. Deputy Loftis called defendant and his wife and asked them to come to the Sheriff's Department because their daughter was involved in an assault.
Defendant and his wife voluntarily arrived at the Sheriff's Department around 6:00 p.m., which was after hours. They were seated on couches in the hallway. Approximately an hour and fifteen minutes later, Detective Frye arrived to conduct interviews regarding the assault. Detective Frye introduced himself todefendant and his wife, telling them that S.B. was fine and that he would be interviewing her regarding the assault. He then proceeded to interview S.B. in the presence of DSS Officer Coward. Detective Frye was skeptical of S.B.'s story but, despite his questioning, she remained consistent.
Following S.B.'s interview, Detective Frye asked if he could speak to defendant, who voluntarily went with Frye to an interview room. Defendant sat closest to the door; was asked if he needed water or a restroom; advised he was not under arrest; that he would not be arrested that night for anything; and that the door to the room was closed just for privacy, not because defendant was not free to leave. Defendant acknowledged that he understood he was free to leave at any time.
Detective Frye then told defendant that S.B. had accused him of sexually assaulting her and he wanted to get his side of the story. After initially denying the allegations, defendant suddenly confessed to having sex with his daughter. Defendant then executed a written statement, which acknowledged he was free to leave, not under arrest, and was not promised anything or threatened into making the statement. It was then read and signed by defendant. Defendant's remorse for the actions was included in the statement and expressed to Detective Frye following the signing of the statement.
Afterwards, defendant was escorted back to his wife, and the two left the Sheriff's Department on their own. The entire interview lasted just over an hour. At no point was defendantplaced under arrest or did defendant request an attorney, or indicate he wanted to leave. Defendant was not charged with a crime that night. He arrived at the station voluntarily and left the station voluntarily.
Defendant asserts that he was under custodial interrogation and should have been advised of his Miranda rights prior to questioning. Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda v. Arizona, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706 (1966). And, whether a reasonable person in the suspect's position would feel free to leave is the test in determining custody. State v. Gains, 345 N.C. 647, 662, 483 S.E.2d 396, 405, cert. denied, Gains v. North Carolina, 522 U.S. 900, 139 L. Ed. 2d 177 (1997). A person is not in custody simply because the questioning occurs at the sheriff's department or because the victim has implicated them; "the definitive inquiry is whether there was a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest." Id. (quoting Oregon v. Mathiason, 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719 (1977).
Since defendant was not under arrest at the time of the questioning there must be factors that when reviewed in their totality create restraint similar to an arrest. See id. Defendant's strongest assertions are that he was placed in the interrogation room; found to be "borderline intellectual functioning"; not fluent in English; and confessed only afterDetective Frye questioned defendant's denials. Yet, the trial court determined that these factors did not amount to custodial interrogation. We agree.
Defendant came to the Sheriff's Department voluntarily and left voluntarily, a circumstance strongly suggesting non-custodial interrogation. See id. at 663, 483 S.E.2d at 405 (citing cases). Defendant was informed he was free to leave, and acknowledged that he understood that fact. Finally, Detective Frye's expression of doubt as to defendant's denials was not coercive. Nothing in the record, when viewed together, suggests that a reasonable person would have felt restrained to the degree similar to an arrest. As such, the trial court did not err in denying defendant's motion to suppress.
Defendant next contends that his right to counsel was violated during the same interrogation. Since, by his own words, he has "not specifically briefed" the issue, cites no cases, and makes no argument for his position, we deem this assignment of error abandoned. See State v. Bonney, 329 N.C. 61, 82, 405 S.E.2d 145, 157 (1991); State v. Streeter, 146 N.C. App. 594, 600, 553 S.E.2d 240, 243-44 (2001); N.C.R. App. P. 28(b)(6) (2004).
Defendant also alleges the trial court erred in admitting statements made by a psychologist who was hired by defense counsel to evaluate defendant. Specifically, defendant asserts that the psychologist's statements, diagnosis, opinions, etc. are protected alternatively by the attorney-client privilege, the doctor-patient privilege, or the work product doctrine. However, as the Statepoints out, the doctor-patient privilege cannot serve to shield information from the jury when a defendant is on trial for child abuse.
Notwithstanding the provisions of G.S. 8-53 [establishing privilege], the physician-patient privilege shall not be ground for excluding evidence regarding the abuse or neglect of a child under the age of 16 years or . . . injuries to such child or the cause thereof in any judicial proceeding related to a report pursuant to the North Carolina Juvenile Code, Chapter 7B of the General Statutes of North Carolina.
N.C. Gen. Stat. § 8-53.1 (2003) (emphasis added). Similar language is found in section 7B-310 of our statutes.
No privilege, except the attorney-client privilege, shall be grounds for excluding evidence of abuse, neglect, or dependency in any judicial proceeding (civil, criminal, or juvenile) in which a juvenile's abuse, neglect, or dependency is in issue nor in any judicial proceeding resulting from a report submitted under this Article, both as this privilege relates to the competency of the witness and to the exclusion of confidential communications.
N.C. Gen. Stat. § 7B-310 (2003) (emphasis added). Although DSS Officer Coward was present at the time of defendant's confession and interview of S.B., it remains unclear if a "report submitted under this Article" resulted in the criminal proceeding, and as such whether this statute governs this case.
We however note that the plain language of section 7B-310 seems to create dual applicability by using the word "nor" and admonishing the use of the privilege in a "judicial proceeding" where abuse is at issue, independent of whether the proceeding resulted from a report. This interpretation is bolstered by thefact that section 8-53.1 uses "related to" instead of "resulting from," as in 7B-310 and these two sections are to be read together. See State v. Etheridge, 319 N.C. 34, 39-41, 352 S.E.2d 673, 677-78 (1987) (supporting this interpretation and applying these statutes to a criminal trial based on rape and other sexual offenses).
That stated, defendant is left relying on either the attorney-client privilege or the work product doctrine to support his contention that the psychologist's evaluations were not admissible at trial. It is unclear from defendant's brief and the record the precise argument defendant has articulated in favor of keeping this information privileged when he, as the State points out, "authorized the attorney and the psychologist to meet with prosecutors and share his statements of guilt and remorse, in the hopes of gaining a more favorable plea bargain."[1] Confidential communications between an attorney and the client or the agents of an attorney and the client will be protected, but that veil of secrecy can be waived by disclosure to a third party. State v. McIntosh, 336 N.C. 517, 524, 444 S.E.2d 438, 442 (1994) (implicit waiver when authorizing attorney to disclose otherwise confidential information for defendant's benefit) (quoting Dobias v. White, 240 N.C. 680, 684-85, 83 S.E.2d 785, 788 (1954)).
Last, defendant argues that the State's failure to comply with N.C. Gen. Stat. § 15A-281 in performing a rape kit on S.B. aftershe reported the incident denied him the right to exculpatory evidence. However, we deem this argument unpersuasive. S.B. testified that she did not report the incident until six days after it occurred and in the interim had washed everything that she could. Detective Frye testified rape kits are only viable up to three days after the incident. Defendant argues in his brief to this Court that five days afterward may still produce viable evidence. Since the incident occurred six days prior to reporting, even under the defendant's calculations the rape kit would have been futile.
For the reasons stated herein, we affirm the trial court's denial of defendant's suppression motions.
Affirmed.
Judges TIMMONS-GOODSON and HUNTER concur.
Report per Rule 30(e).

Since defendant did not brief the issue, we do not pass judgment on the interplay between waiver of the attorney-client privilege and the inadmissibility of information disclosed pursuant to plea bargaining negotiations as noted in Rule 410 of the North Carolina Rules of Evidence.