[Cite as *In re J.A.*, 2023-Ohio-4388.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: J.A. | : | APPEAL NO. C-230076<br>TRIAL NO. 20-2333-Z |
| | : | *O P I N I O N.* |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Reversed and Appellant Discharged

Date of Judgment Entry on Appeal: December 6, 2023

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Paula E. Adams*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, *Margaret Kane*, Assistant Public Defender, and *Jessica Moss*, Assistant Public Defender, for Defendant-Appellant.

**KINSLEY, Judge.**

{¶1} Defendant-appellant J.A. appeals the judgment of the Hamilton County Juvenile Court adjudicating him of rape in violation of R.C. 2907.02(A)(2), a felony of the first-degree if committed by an adult. After careful review of the record and relevant case law, we conclude that even when looking at the evidence in the light most favorable to the state, there is insufficient evidence to support J.A.'s adjudication. Accordingly, we reverse the judgment of the trial court and discharge appellant from further prosecution.

### *Factual and Procedural Background*

{¶2} T.A. ("Mother"), the mother of J.A., worked in childcare for years. While working at a daycare in 2015, Mother met K.T., the complaining witness, when he was 18 months old. Mother and K.T.'s family developed a relationship, and K.T. followed Mother when she changed daycares. In August 2019, Mother left the daycare where she had been working and K.T. was attending. At that point, K.T.'s mother, A.P., withdrew him from the daycare and asked Mother to care for him at her home, which she had occasionally done in the past.

{¶3} On October 11, 2019, Mother picked K.T. up from his home, as she often did, to take him to her house for the day. Mother had three children of her own that were also at home that day: J.A., her 11-year-old son; her 18-month-old daughter; and her seven-month-old daughter. On this particular day, J.A. was at home because his school was on fall break. Mother arrived home with K.T. around 8:30 a.m. Although Mother watched K.T. at her home, she still worked a separate job where she transported patients back and forth from doctor's appointments. On this day, Mother had to work her other job, so she called her grandmother, V.K. ("Grandmother"), to

watch the children while she went to work for a few hours. Mother left to go to work sometime between 9:00 a.m. and 10:30 a.m.

{¶4} While Grandmother was watching the children, K.T. asked J.A. to play the game Roblox. According to K.T., J.A. responded that he would have to complete a "challenge" first in order to play. K.T. described the challenge somewhat differently during a pretrial interview and on the stand at trial. However, in both statements, K.T. indicated that the challenge was that K.T. had to perform oral sex on him. K.T. also indicated in his pretrial interview that while doing this challenge, J.A. stuck his penis in K.T.'s anus, although he had to be reminded of this at trial. Following the completion of the challenge, K.T. played Roblox. Mother arrived back home sometime between 2:00 p.m. and 2:30 p.m. and took K.T. home around 5:00 p.m. K.T. never disclosed to Mother or Grandmother what took place. When questioned why he didn't tell either of them, he testified that he forgot.

{¶5} When K.T. arrived home, he told his mother what had occurred between him and J.A. Following his disclosure, K.T. was taken to Cincinnati Children's Hospital where a rape kit was performed. He was later taken to the Mayerson Center, where a pretrial forensic interview was conducted.

{¶6} On June 25, 2020, J.A. was charged with rape in violation of R.C. 2907.02. The complaint alleged that J.A. "did engage in sexual conduct, to wit: insertion of body part or object into vagina or anus by touching his penis on the victim's buttock rectal area, and having the victim perform oral sex on the suspect, not his or her spouse, and being a person under thirteen years of age, ability of him/her to resist or consent was substantially impaired because of to him/her [sic] by force, threat of force, or deception * * *."

{¶7} On January 20, 2022, the case was set for trial in the Hamilton County Juvenile Court before a magistrate. The trial proceeded as follows.

*A. Competency Hearing*

{¶8} Before the trial began, a competency hearing was held. At the time of the competency hearing, K.T. was seven years old. During this hearing, he was questioned by both the state and the defense. He was asked questions to establish whether he understood the difference between the truth and a lie. Following the questioning of K.T. by both parties, the magistrate found K.T. to be competent to testify, over the objections of defense counsel. The trial proceeded immediately after.

*B. Trial*

1. <u>The State's Case</u>

{¶9} At trial, the state presented five witnesses: (1) A.P.; (2) K.T.; (3) Detective Brian Brown; (4) Simone Collier; and (5) Tracy Sundermeier.

{¶10} A.P. testified that she met Mother at her son's daycare and that they had developed a relationship. She also testified that K.T. disclosed to her what occurred between him and J.A. at Mother's house. She testified that after the disclosure, she called K.T.'s father, and they took K.T. to the hospital.

{¶11} K.T. testified at trial, although he initially stated that he did not want to testify. He recounted that J.A. told him that he had to complete a "challenge" in order to play Roblox. He testified that J.A. made him suck "the part where you pee." When asked if he could identify J.A. in the courtroom, K.T. had difficulty. Initially when questioned about what happened between him and J.A., K.T. testified that the only thing that happened between the two of them was oral sex. He also testified numerous times that he had his clothes on the entire time. However, the state moved to refresh

his recollection with the Mayerson Center interview that had previously taken place. After seeing the Mayerson interview, K.T. testified that J.A. had penetrated him anally and that his clothes were off during the incident. Although he identified himself in the Mayerson interview, he also testified that he did not recall the conversation that was recorded and that he was surprised to learn that he said his clothes were off.

{¶12} Detective Brian Brown testified that he was the one that interviewed J.A., who at the time was 11 years old. Brown testified that when asked about the incident, J.A. would close his eyes, which he interpreted as a sign of lying. J.A. denied the sexual conduct during the entire interview.

{¶13} Simone Collier was a nurse at Cincinnati Children's Hospital. She testified that she was the nurse that conducted K.T.'s rape kit. She also testified as to the procedure for taking the rape kit.

{¶14} Tracy Sundermeier, a forensic biologist at the Hamilton County Coroner's Forensic Crime Lab, testified that she is responsible for analyzing items involved in criminal matters for the presence of bodily fluid and DNA. The parties stipulated to her expertise. Sundermeier testified that she conducted the DNA test on K.T.'s underwear, where she found a mixed sample, meaning more than one person's DNA was present, one of which was J.A.'s. Sundermeier testified that the DNA collected was a weak positive and that she found it when she swabbed the front interior crotch of the underwear K.T. was wearing. She also testified to various ways that DNA can be transferred, such as storing clothes together, sharing bathrooms, and washing clothes together.

2. The Defense's Case

5

{¶15} The defense also presented five witnesses: (1) Grandmother; (2) Mother; (3) Patience Fuller; (4) J.S.; and (5) Sarah Reis.

{¶16} Grandmother testified that she is the great-grandmother of J.A. She testified that she was watching the children at Mother's home while Mother went to work. Regarding the incident between K.T. and J.A., Grandmother's testimony was very limited, as she did not observe the incident. She did testify that she had to stop K.T. from going up the stairs several times that day.

{¶17} Mother testified that K.T. had exhibited concerning inappropriate behavior at other times while in her care. Particularly, she testified to a recording of K.T. saying inappropriate things to her 18-month-old daughter. Mother explained that while taking care of K.T., she helped "potty train" him. She explained that this included washing his clothes with her and her family's, and that she would sometimes give K.T. some of J.A.'s smaller underwear when he had accidents. Mother also testified that she had given some of J.A.'s smaller clothes to A.P. for K.T. to have since J.A. had outgrown them.

{¶18} Patience Fuller was one of K.T.'s former daycare teachers. She testified that she had observed some behavioral problems with K.T. while at daycare.

{¶19} J.S. is the grandfather of J.A. He testified that he had previously observed K.T. "gyrating" on Mother's 18-month-old daughter.

{¶20} Sarah Reis was the specialized assessments supervisor at the Hamilton County Department of Job and Family Services ("JFS"). She managed the referral for neglect and sexual abuse in this case. She testified that the case was opened in October 2019, and was closed in December 2019, as unsubstantiated as to both the sexual

abuse and neglect. She testified that JFS did not determine J.A. to be in a caretaker role with respect to K.T. She also testified that J.A.'s age factored into the outcome.

*C. Disposition and Objection*

**{¶21}** On June 6, 2022, the magistrate adjudicated J.A. delinquent of rape, ordered a presentence probation investigation, and scheduled the case for disposition. The defense filed a timely objection, raising the following issues: (1) K.T. was improperly determined to be competent; (2) K.T.'s in-court identification was improper and unreliable; (3) K.T.'s testimony at trial was inconsistent with the allegations; (4) Collier was improperly permitted to testify; (5) the lab report with the DNA results was given improper weight; (6) the defense's Crim.R. 29 motion for an acquittal was improperly denied; (7) the evidence presented was insufficient; and (8) the allegations did not allege force. A hearing on the objections was heard July 28, 2022.

**{¶22}** On November 9, 2022, the trial court denied the objection. Regarding the first issue raised by the defense on objection, the trial court found that K.T. was able to discern between a lie and the truth. As to the second issue, the trial court acknowledged that K.T. could not initially identify J.A.; however, the court treated his difficulty as one bearing on credibility not admissibility. As to the third issue, the trial court found that the magistrate was in the best position to determine credibility. As to the fourth and fifth issues, the trial court summarily overruled them. The trial court addressed the sixth, seventh, and eight issues together. The trial court found that J.A. "was much older" than K.T. and was in a "position of power." The trial court also stated that "[w]hile there was no direct evidence of force used in this matter, the Court finds there was sufficient circumstantial evidence to find the State proved Juvenile

committed an act, which, if he were an adult, would constitute the offense of rape pursuant to division (A)(2) of section 2907.02 of the revised code beyond a reasonable doubt." Ultimately, the trial court overruled all of J.A.'s objections.

{¶23} On January 4, 2023, the trial court entered its disposition. At this time J.A. was 14 years old. The trial court placed J.A. on probation, imposed a suspended sentence to the Department of Youth Services until he is 21 years old, and ordered him to complete a sex-offense-specific outpatient treatment program.

{¶24} J.A. now brings this timely appeal.

### *Insufficient Evidence*

{¶25} J.A. raises three assignments of error on appeal. First, J.A. argues that the trial court erred in finding K.T. competent to testify. Second, J.A. argues that there was insufficient evidence to support his adjudication. Third, J.A. asserts that his adjudication was against the manifest weight of the evidence. We address J.A.'s second assignment of error first because it is dispositive of this appeal.

{¶26} In J.A.'s second assignment of error, he argues that there was insufficient evidence for the trial court to adjudicate him because the state failed to provide evidence of every element of the offense of rape under R.C. 2907.02. J.A. breaks his argument into two subarguments. First, he argues that due to his age at the time of the offense, he was a member of a protected class. Second, he argues that the state did not present evidence to meet the element of force under R.C. 2907.02(A)(2).

{¶27} To determine whether a conviction is supported by sufficient evidence, we inquire "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574

N.E.2d 492 (1991), paragraph two of the syllabus. *See State v. Curry*, 1st Dist. Hamilton No. C-190107, 2020-Ohio-1230, ¶ 11.

{¶28} In *In re D.B.*, 129 Ohio St.3d 104, 2011-Ohio-2671, 950 N.E.2d 528, ¶ 28, the Ohio Supreme Court held that R.C. 2907.02(A)(1)(b) is unconstitutional as applied to a child under the age of 13 who engages in sexual conduct with another child under the age of 13 in the absence of proof that: (1) the offender substantially impaired the other person's judgment or control, R.C. 2907.02(A)(1)(a); (2) the other person's ability to resist or consent was substantially impaired because of a mental or physical condition, R.C. 2907.02(A)(1)(c); or (3) the offender compelled the other person to submit by force or threat of force, R.C. 2907.02(A)(2).

{¶29} In this case, both J.A. and K.T. are under the age of 13. Thus, R.C. 2907.02(A)(1)(b) cannot be constitutionally applied to J.A. in the absence of one of the three circumstances identified in *In re D.B.* Here, the state focused on the third factor—"the offender compelled the other person to submit by force or threat of force"—as a basis to pursue charges against J.A.

{¶30} In the general sense, force in the context of rape has typically been interpreted to mean *physical* force. To prove the offense of rape under R.C. 2907.02(A)(2), both the criminal code and case law construing it have required the defendant to exert violence, compulsion, or constraint against the victim through physical means or to create the belief that physical force will be used if the victim does not submit. *See* R.C. 2901.01(A)(1) (defining "force" for purposes of rape as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing"); *State v. Schaim*, 65 Ohio St.3d 51, 600 N.E.2d 661 (1992), paragraph one of the syllabus.

**{¶31}** However, where the allegations involve sexual conduct between a child and an adult, the Ohio Supreme Court has held that psychological coercion can be a proxy for physical force in certain circumstances, such as when a parent sexually abuses a child. *See State v. Eskridge*, 38 Ohio St.3d 56, 58-59, 526 N.E.2d 304 (1988). In such cases, the relationship between the child and the adult can create inherent coerciveness and an "unspoken threat of force" due to the position of authority that the adult holds over the child. *Id.* Subsequent case law has clarified that, for this reduced standard of force to apply, the defendant must be an adult in a position of authority over a child under the age of 13. *See, e.g., State v. Dye*, 82 Ohio St.3d 323, 329, 695 N.E.2d 763 (1998) ("[A] person in a position of authority over a child under thirteen may be convicted of rape of that child with force pursuant to R.C. 2907.02(A)(1)(b) and (B) without evidence of express threat of harm or evidence of significant physical restraint."). Moreover, to prove the element of force, "the statute requires that some amount of force must be proven beyond that force inherent in the crime itself." *Id.* at 327.

**{¶32}** While this court has not addressed the element of force between two juveniles under the age of 13, the Eighth District in *In re L.R.F.*, 2012-Ohio-4284, 977 N.E.2d 138 (8th Dist.), has provided some guidance. In that case, the complaining witness, T.H., testified that when she was six years old, her then ten-year-old cousin, the defendant, witnessed her kiss a boy as part of a dare. *Id.* at ¶ 3. A few weeks later while at their grandmother's house, the two went to the basement together to turn the television off. *Id.* at ¶ 4. While in the basement, the defendant told T.H. to "suck his area." *Id.* If she didn't, he threatened to tell their grandmother about the dare. *Id.*

T.H. testified that she complied. *Id.* T.H. testified that she felt that her cousin was "blackmailing" her by threatening to tell their grandmother about the dare. *Id.* at ¶ 5.

{¶33} Considering whether there was sufficient evidence of force in the case, the Eighth District noted that "the type and amount of force necessary to purposefully compel a victim to submit 'by force or threat of force' depends on the victim's and offender's relationship." *Id.* at ¶ 15. Because both the accused and the alleged victim were under the age of 13 and the accused was therefore not in a position of authority over the victim, the court declined to apply the relaxed definition of force applicable to parent-child rape cases. *Id.* at ¶ 22.

{¶34} Instead, in the absence of proof of actual force, the court of appeals analyzed whether the state presented sufficient evidence that the defendant "created the belief that physical force would be used if T.H. did not submit to the sexual conduct." *Id.* at ¶ 27. Ultimately the court concluded the evidence was lacking in this regard. While T.H. feared "getting in trouble" if she did not perform the requested sexual act, nothing in her testimony suggested she feared physical violence as the statute requires. *Id.* As the court emphasized, "the threat of ostracism does not neatly qualify as a threat of force because it is not a physical compulsion * * *." (Internal citation omitted.) *Id.*

{¶35} From a factual standpoint, this case is remarkably akin to *In re L.R.F.* At the time of the incident, both J.A. and K.T. were under the age of 13. The testimony presented at trial through K.T. was that he asked to play Roblox, and J.A. responded that he had to complete a "challenge" first. When asked about what happened between him and J.A., K.T. testified, "I wanted to play Roblox, and then he said you have to do something first." K.T. also testified that, "[l]ike I wanted to play it, but I

had to do it so I did it." As in *In re L.R.F.*, the testimony reflects that K.T. was asked to perform a sexual act, and he complied.

{¶36} However, the evidence of coercion was more extensive in *In re L.R.F.* than in this case. In *In re L.R.F.*, T.H. testified that she felt as if she was "blackmailed" because her cousin threatened to tell their grandmother if she did not comply. Here, there is no evidence that K.T. was "blackmailed" or that there was a threat that he would be in trouble if he refused J.A.'s requests. The state asks that we interpret K.T. testifying that he was "snuck" upstairs to perform the act as evidence that J.A. had leverage over him. However, the only evidence in the record is that K.T. wanted to play Roblox and engaged in sexual conduct to be able to do so, even though he did not necessarily want to do it.

{¶37} Similar to *In re L.R.F.*, the state asserts that the victim in this case was forced through psychological coercion to engage in sexual conduct with J.A. and that the relaxed standard of force applies. However, like the Eighth District, we decline to make that holding. There is no evidence in this case that J.A. and K.T.'s relationship involved inherently coercive dimensions similar to a parent and child or that J.A. was otherwise in a position of authority over K.T., such that K.T. would feel compelled to obey J.A. Thus, the relationship between J.A. and K.T. does not supply a proxy for physical force.

{¶38} The trial court appeared to recognize as much, because it failed to rely in its judgment entry on the relationship between J.A. and K.T. as a basis for its adjudication. Rather, the trial court emphasized the age disparity between J.A. and K.T. to conclude that J.A. was in a position of power. The state also points to a size disparity between the two as an indication of force. But there is no evidence to suggest

that K.T. was intimidated by J.A.'s age or size. While there is testimony that J.A. was "a lot older" and "taller than me," these descriptions alone are not sufficient to prove that K.T. was forced to engage in any activity. There was no evidence presented regarding the potential impact that J.A.'s age and size had on K.T. during the incident. There was no testimony that K.T. felt overpowered or feared J.A. because of his size. We will not assume that the existence of a size and age disparity between J.A. and K.T. caused K.T. to fear physical force if he rejected J.A. in the absence of evidence that that was the case.

{¶39} Therefore, looking at the evidence in the light most favorable to the state, the state failed to introduce sufficient evidence that J.A. exerted violence, compulsion, or constraint against K.T. through physical means or created the belief that physical force would be used if K.T. rejected J.A.'s requests, as required by R.C. 2907.02(A)(2).

{¶40} Appellant's second assignment of error is sustained. As a result, appellant's first and third assignments of error are made moot and we do not address them. *See* App.R. 12(A)(1)(c).

{¶41} The judgment of the trial court is accordingly reversed, and J.A. is discharged.

Judgment reversed and appellant discharged.

**ZAYAS, P.J.,** and **BOCK, J.,** concur.

Please note:
   The court has recorded its own entry on the date of the release of this opinion.